**Raymond SANTIAGO, et al., Plaintiffs,**

**v.**

**Ronald MILES, et al., Defendants.**

**No. Civ. 86–694L.**

United States District Court,
W.D. New York.

Oct. 1, 1991.

See also 121 F.R.D. 636.

John Boston, Claudette Spencer, Legal Aid Soc., New York City, for plaintiffs.

Elizabeth J. McDonald, Asst. Atty. Gen., Joseph Gelormini, Dept. of Law, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

This is a class action brought by black and hispanic inmates at the Elmira Correctional Facility ("Elmira") in Elmira, New York claiming widespread discrimination at the facility on the basis of race in violation of the Fourteenth Amendment of the Constitution and 42 U.S.C. §§ 1981 and 1983.

In general, plaintiffs claim that officials in charge of Elmira have, for the most part, ignored blatant racism that pervades Elmira and that such conduct violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs claim, specifically, that blacks and hispanics are routinely discriminated against by the mostly white guards and administration with respect to housing, employment and discipline. Plaintiffs claim that white inmates are given better jobs, preferable housing and disciplined less frequently than is the case with black and hispanic inmates.

Plaintiffs request that the Court declare that these policies violate the Equal Protection clause of the Fourteenth Amendment and enjoin the policies and procedures at Elmira that result in discrimination on the basis of race. Plaintiffs request that the court fashion appropriate prospective relief to ensure that decisions concerning housing, job assignments and discipline are based only on race-neutral factors.

This action was commenced in 1986. The defendants are the top administrators of the prison at that time.

Defendant Ronald Miles was the Superintendent of the prison from April 1985 to August 1988, and defendants Howard Novak and Donald McLaughlin previously served respectively as Deputy Superintendents of Security and Programs under Superintendent Miles. These defendants deny any personal responsibility or involvement in any alleged acts of racism.

Defendants deny the existence of race discrimination at Elmira at the present time, although they concede that prior to commencement of the lawsuit there may have been some practices and procedures in effect that caused whites to receive preferential treatment in certain matters. Defendants claim that whatever discriminatory practices existed previously have now been corrected, in part, because of this lawsuit, and at this time race is no factor in making job assignments, allocating housing or imposing discipline on inmates.

The case was tried to the Court and the Court took several weeks of testimony and received substantial documentary evidence as well. In support of their case, plaintiffs called twenty-three witnesses,[1] including four former staff members and administrators at the facility, an expert witness who did a statistical analysis concerning housing, jobs and discipline as well as eighteen former and present black and hispanic inmates. Thirteen former and present prison employees testified for the defense. In addition, the parties have submitted extensive posttrial briefs.

This decision constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

I find that plaintiffs have proven the existence of a pattern of racism at the Elmira Correctional Facility. This racism goes beyond verbal taunts and racial slurs uttered by guards to minority inmates. The racism affects job placement, housing assignments and discipline at Elmira to a degree that is unacceptable under the principles of equality that form the basis of our government. Therefore, court intervention is warranted and an injunction must be

---

1. Of the six named plaintiffs, three, including Aaron Mays, Mark Steele and Jeremiah Smith, testified personally.

entered to guarantee that such practices cease.

Prisons are ugly places. The inmates are often society's worst failures. The job of maintaining prisons and supervising its inmates is a very difficult, dangerous and often unappreciated task. But no matter how difficult the task facing prison administrators, racism must play no part in the operation of a prison. Racism is never justified; it is no less inexcusable and indefensible merely because it occurs inside the prison gates. As a society we have made a commitment to equality under the law. This goal has not yet been achieved and perhaps never will be unless those who govern take firm steps to eradicate racism whenever they are able to do so. When racism is proven, federal courts must be especially vigilant to insure that all citizens—even the most unpopular—are guaranteed the equal protection guaranteed by the Constitution.

## I. FACTS

Plaintiffs' proof consisted of both direct and circumstantial evidence that race was a factor in making decisions at Elmira concerning housing, jobs and discipline. Plaintiffs presented substantial anecdotal evidence of racism relating to these areas. Most of plaintiffs' witnesses and some defense witnesses testified concerning instances of racial harassment and verbal abuse by white corrections officers.

Plaintiffs also presented extensive statistical evidence of discrimination in housing, jobs and discipline by Dr. Ronald Christensen. Dr. Christensen testified about the significant statistical disparities between white inmates and minority inmates as to placement in preferred housing, assignment of jobs or programs and as to the imposition of discipline.

### A. Housing

The Elmira Correctional Facility is a maximum security prison with approximately 1,352 inmates. Inmates are housed in nine separate buildings called blocks. These blocks vary in size, cleanliness, and safety. Certain blocks are definitely con-

sidered to be preferred by inmates. The evidence established that the preferred housing units were well known by both inmates and staff.

The two largest blocks, G Block and I Block are considered the least desirable. I Block, in particular, is often referred to as a "slum" and a "jungle." These two blocks are much larger than the others and are considered much nosier, dirtier and in many cases much more dangerous. There was testimony that in these larger blocks, many inmates prefer to be placed in the front area of the block so that they would be more observable and closer to the guards if trouble should occur. Other, smaller blocks are much more pleasant and much more desirable. These blocks include E and F which had approximately 100 inmates per unit and H and D Block which were the smallest blocks with approximately 54 beds.

Plaintiffs' claim, in a nutshell, is that there is, and has always been, a disproportionate number of whites assigned to the preferred housing blocks than is the case with black and hispanic inmates. Plaintiffs claim, and I believe the statistical evidence supports the claim, that whites are more often placed in the smaller blocks and in D Block, the Honor Block, than should be the case based on their percentage of population.

Blocks A and B are connected with the Elmira Reception Center for Juveniles and are not at issue in this lawsuit. As now constituted Block C is primarily used for inmates going through orientation and for inmates employed in food services and in the hospital. D Block is the Honor Block. E Block primarily houses those working in the prison industries, the employee staff restaurant and the Reception Center. F Block is for college students and those working outside the prison. H Block, since June of 1988, houses those in the Intermediate Care Program which is run in conjunction with the Office of Mental Health and is a facility designed to give mental health counseling to inmates in order to get them back into the general population. G Block and I Block are described as general

program blocks housing a large number of inmates involved in various job programs.

The size of the blocks vary. D Block, the Honor Block, and H Block are the smallest, housing 54 inmates. E and F Block had about 100 inmates each. C Block had 250 inmates. G and I Block were the largest with about 300 inmates each.

The evidence was quite clear that the smaller Blocks, E, F and H and the Honor Block, were the preferable housing blocks and that the larger Blocks, G and I, were much less desirable. Many of the inmate witnesses described this as did several prison administrators.

Former Superintendent Bert Ross and a former guard, Roland Coleman, corroborated witness testimony concerning the preferred housing blocks. Inmate counselors Thomas Rupp and Jerome Kaplan both corroborated inmate testimony that G and I Blocks were often referred to as "ghetto" or "slum" blocks.

Both prior to and subsequent to the filing of this lawsuit, the general perception of the inmates was that there was a disproportionate number of whites in the preferred housing units and also a greater proportion of minorities in the less desirable housing blocks. That the inmates understood and perceived this disparity is not really in dispute. What is remarkable is that many prison administrators noticed the same discrepancies but did little to correct the situation.

Bert Ross became Superintendent at Elmira in September 1988. At trial, he admitted that there was a long "tradition" at Elmira that white inmates would get preference for housing in the Honor Block. When he became Superintendent, he recognized that this Block had a disproportionately high number of white inmates which he believed to be about 40% at that time. He also admitted that when he first met with the Inmate Liaison Committee, they complained about discrimination in housing. Ross also testified that when he was assigned to Elmira in 1985 as the First Deputy Superintendent, he observed a disproportionate number of whites in D Block and in other blocks. This tradition of placing whites in certain cell blocks also applied to certain jobs which consistently were given to whites.

Mel Hollins, who served as a corrections officer at Elmira, testified at his deposition that the white inmate population in Blocks D, E, F and H was disproportionate to their numbers in the general population. In his judgment, this was caused by the racial bias of the prison administrators who made decisions concerning housing. Hollins particularly noted the disparity in H Block, one of the smallest blocks. Moreover, Hollins testified that following an escape by three white inmates from the Honor Block in 1983, a "shock wave" ran through the facility, causing staff to question why white inmates who had been imprisoned for only a short time had been housed in the Honor Block to begin with. *See generally* Ex. 71 at 8–16.

Corrections Officer Roland Coleman stated that, toward the beginning of his tenure at Elmira, he observed very few minority inmates in F and E Blocks. Although this changed somewhat during his employment at the prison, he did not describe the changes as very substantial. *See* Tr. Vol. IA at 944–45.

George Bartlett, the present Superintendent at Elmira testified that when he became Superintendent he noticed that the Honor Block was not balanced by race although he claimed that he took steps to correct that. He testified that ethnic balancing is now being attempted in the Honor Block by attrition, that is, when vacancies occur preference is given to minority inmates. He has taken no steps to balance the other blocks since he believes that all of the other housing is arranged according to job or program assignment.

Plaintiffs' anecdotal evidence of the disparity between whites and minorities was amply corroborated by plaintiffs' expert witness, Dr. Ronald Christensen. Dr. Christensen's educational and employment background was most impressive. Dr. Christensen's resume (Ex. 30) shows that his experience in statistics and data analysis is extensive and varied. In sum, I credited Dr. Christensen's testimony and accept

the conclusions that he reached based on his analysis. Although defendants challenged Christensen's findings in their post-trial briefs, his testimony stands unrebutted at trial. There was no evidence introduced to contradict Dr. Christensen's statistical analysis.

Dr. Christensen computed the statistical significance of the disparities between white and minority inmates using a standard statistical methodology.[2] Statistical significance measures the likelihood that the relationship or difference between two quantities could have occurred by random chance. He used a significance level of .05 (one in 20) as the level where the disparity between measured items had some statistical significance. (Tr. Vol. I, 39–39). In Christensen's opinion, statisticians recognize the .05 level as representing approximately two standard deviations from the norm or average disparity that would be expected. (Tr. Vol. I, 59–60). He determined that any disparity between measured groups at a level of .05 or less was statistically significant. He determined that based on the statistics, chance could not have caused the disparities and that these disparities were related to the race of the inmates. (Tr. Vol. I, 42–44).

Christensen performed a statistical analysis of the housing at Elmira, comparing whites with blacks and hispanics. He performed this analysis by analyzing "cell books" maintained by the facility. The cell book identifies each inmate by name, race, program assignment and cell block on each day of the year. Christensen selected 11 separate days from January 1985 to February 1990 (Ex. 32).

Christensen's conclusion was that white inmates were housed more frequently in the preferable housing blocks (E, F, and H) than should have been expected when compared with their relationship to the prison population as a whole. In his opinion, this deviation was so significant that the disparity could not have occurred by chance. In his view, there was no plausible explanation for the dramatic deviation except for race.

Exhibit 32 is a compilation of the data studied by Dr. Christensen, showing the proportion of whites in certain "preferred" housing areas in comparison with the proportion of whites in the general prison population. Exhibit 33 is the expert's analysis of the statistical significance of this data.

For each date for which a cell book was produced, Exhibit 32 makes two separate comparisons. First, the percentages of white, black and hispanic inmates occupying cells in the smaller and larger blocks are compared with percentages of such inmates in the general population of the prison. For example, the January 25, 1985 cell book reveals that on that date, white inmates comprised 19 percent of the total prison population, but whites made up 30 percent of the inmates housed in E, F and H Blocks, and only 14 percent of those housed in the larger less desirable Blocks, C, G and I. Exhibit 33 then sets forth the statistical significance of this result, and with reference to January 25, 1985 denotes a *.001 probability that the result would occur by chance.[3] In other words, the chance is less than one in a thousand that the disparity would occur by chance. In Christensen's opinion, such a deviation virtually eliminated the possibility that the assignment occurred by chance.

An analysis of these cell books shows clearly that whites consistently were housed in the more preferable blocks, to an extent that was way out of proportion to their percentage of population.

For example, although whites comprised 20% of the total prison population on June 21, 1985, they represented 34% of inmates

**2.** Christensen described the procedure as the Poisson Distribution Technique which he characterized as a standard test for determining statistical significance (Tr. Vol. I, 34–35).

**3.** The asterisk signifies that the probability is actually less than .001; the results apparently are analyzed only to three significant figures.

It is also worth noting that characterizing the significance factor as the probability that a result would occur at random is perhaps not as accurate as describing it as the chance that a result would occur were race not a factor.

housed in the more preferable E, F, and H Blocks. Whites, on the other hand, represented only 15% of the population in the less desirable blocks.

On March 7, 1986, whites comprised only 19% of the total prison population, yet they represented 33% of the inmates housed in the more preferable blocks. On June 4, 1986, the percentage was the same. In sum, on all dates analyzed, the percentage of whites as compared to their percentage of the total prison population was much greater in the preferable housing blocks.

Dr. Christensen also analyzed the percentages of each ethnic group that had been housed in the various housing blocks. In every case, the percentage of whites living in the preferable blocks far exceeded the percentage of whites in the prison population. For example, on January 25, 1985, 30% of the white population was housed in the preferable blocks. Although blacks comprised 61% of the total prison population, only 21% of the blacks were housed in the preferable blocks. Seventy-six percent of the blacks in the institution were housed in the larger, less desirable blocks.

Although Dr. Christensen did not analyze the significance of disparities in the racial makeup of the population in D Block, the Honor Block, plaintiffs' Exhibit 34 lists the percentages of white inmates in each housing block. In January 1985, whites comprised 35 percent of the D Block population, and, although that percentage declined steadily until March 1987, it then rose dramatically to reach 43 percent in January 1989 and 39 percent in September of that year. Similarly, Exhibit 34 shows gross disparities in the ethnic makeup of H Block.

These gross numbers are significant in themselves. Dr. Christensen's statistical analysis of these figures (Ex. 33) is even more compelling.

Dr. Christensen determined that the disparities between white inmates and minority inmates was so great that chance could not have produced the result. Based on his analysis, race must have been a factor in producing the measured deviations. Using the significance level of .05 (two standard deviations) as a gauge, he found that on virtually all of the dates analyzed, the deviation was at least .001 which placed it well beyond two standard deviations.

Dr. Christensen described the statistical disparities as very significant and the data virtually eliminated any possibility that these disparities could have occurred by chance. Because these deviations occurred over a lengthy period of time and because they were consistent and significant, he concluded that the race of the inmate was the factor that caused the deviation.

The defense did not introduce expert testimony to counter Dr. Christensen's findings. In essence, the defense was that although there had been past instances of housing discrimination, changes were made by successive superintendents to eliminate race as a factor in making housing assignments. Defendants offered proof to show that housing is now allocated, for the most part, according to program assignments. Inmates with the same "program", whether educational or occupational, were housed in the same block. In addition, there was testimony that efforts were made to admit more minorities to the Honor Block.

David Post testified that he was a Senior Corrections Counselor at Elmira and was the Chairman of the Honor Block Committee from October 1988 to August of 1990. He believed that because of the instant lawsuit, he was directed in approximately mid–1989 to monitor the racial makeup of D Block to see that it more closely resembled the population mix of the prison. This process is continuing but is slow since most inmates do not voluntarily leave D Block. By attrition he is attempting to place more minorities in the block.

Post also testified that the Honor Block Committee retains great discretion in deciding whether inmates should be assigned there. For example, he asserted that the committee may decide to keep an inmate on the block even though he may have committed disciplinary infractions which would otherwise result in his automatic removal. See Tr. Vol IIA at 526–29. Some indication that this practice can result in discrimination came from the deposition testimony of

Curtis Coley, Supervisor of the Inmate Grievance Program. Based on his conversations with and observations of inmates and counselors, Coley testified that, when the committee decides whether to admit a given inmate, "[u]sually the smallest details on the [black] inmate's record is brought in as a factor, okay. Sometimes it isn't always that way with white inmates." Ex. 70 at 74.

Richard Cerio testified that in 1985 he was directed by defendant McLaughlin to begin implementing a housing realignment plan. The goal appears to have been to house inmates according to job assignment, in large part to facilitate the movement of inmates between the cells and program assignments.

Dr. Christensen's statistical evidence, however, revealed that the proportion of whites in the small housing blocks did *not* decrease substantially and uniformly after the housing realignment proposal was implemented. In part, this may have been due to the discretion that remained with corrections officers to fill extra cells not filled according to job assignment. For example, these so-called "out of category" cells in desirable blocks were filled by whites at a rate of 46 and 44 percent in March and November 1987, respectively.

Not only are these statistics particularly disturbing, but, when asked whether disparities existed despite the realignment plan, staff who were purportedly in charge of implementing the plan simply responded "I don't know." *See, e.g.,* Tr. Vol. II at 196 (Cerio); Vol. IIA at 497 (Barnes). It is thus evident that these officials had not bothered to inform themselves of the effectiveness of their own so-called remedial measures.

Defendant Miles exhibited a similar attitude at his deposition. When asked whether he monitored ethnic balancing in housing following implementation of the realignment proposal, Miles answered in the negative. When queried whether anyone monitored the situation, he replied "I have no idea." *See* Ex. 63 at 70–71.

## B. Jobs

Plaintiffs complain that there is racial discrimination in the assignment of jobs and programs at Elmira. Plaintiffs claim that certain jobs—preferred jobs—are held principally by white inmates and that blacks and hispanics are underrepresented in these preferable jobs.

The evidence established that certain jobs were viewed as better than others by the inmates. Both prisoners and prison administrators had little trouble identifying those preferable jobs. They included maintenance, housing block clerks, porters, cage floor workers, officers' mess hall, print shop, bakery and various clerical positions. [Exs. 24, 34A]. Plaintiffs claim that some of these jobs have been and continue to be assigned on the basis of race.

It is clear that prior to 1984, job assignments were made in several ways. Corrections counselors and staff could make requests concerning the placing of inmates. This led to the tradition of placing whites in preferable jobs. The Inmate Program Committee at that time handled mostly cases where inmates worked outside the prison. From 1984 the Inmate Program Committee should have been responsible for all job assignments and transfers. In 1986 an Inmate Program Placement Coordinator (IPPC) was hired who became chairman of the Program Committee.

I find from the evidence that prior to the mid–1980's there was a well-established tradition at Elmira that certain jobs were routinely given to white inmates. Testimony concerning that fact came from several sources. Bert Ross, the Superintendent at Elmira from 1988 to 1990 testified that there was such a tradition in existence, although he insisted that he took steps to change it during his tenure.

Otu Obot testified that he was employed at Elmira from June of 1988 until November of 1989 as the Inmate Program Placement Coordinator. When he arrived at Elmira, he was told by his superiors and by others that it was "tradition" that certain premium jobs had been assigned to white inmates.

Regarding the "tradition" of discriminatory job assignments, retired Officer Roland Coleman testified that when he began his employment at Elmira, in the early 1960's, he observed that most of the jobs he considered "good" were staffed by white inmates. By the end of his tenure, in 1982, Coleman testified there were some changes in this pattern, but he termed those changes "slight." *See* Tr. 1, Volume 1A at 935–43.

Mel Hollins testified at his deposition that in 1979 there existed a "tradition" of assigning white inmates to desirable jobs. *See* Ex. 71 at 33. He also stated, however, that since that time, changes had been made, occasioned in large part by turnover of the top administrators. *See Id.* 33–34.

Deputy Superintendent McLaughlin testified that, prior to 1985, he had become aware of racial disparities in both the commissary and employee restaurant. *See* Tr. Volume 2 at 343, 355. His awareness concerning the restaurant could have dated as far back as 1979. *Id.* at 355.

Various staff members, including Counselors Kaplan and Cerio, as well as Deputy Superintendent Novak, testified either at trial or deposition that they had, on several specific occasions, observed disparities in preferred jobs. According to Kaplan, he attributed this to the fact that "some employees were asking for certain people." *See* Ex. 72 at 23.

Several inmates who testified provided direct evidence that certain jobs were traditionally held by white employees. For example, inmate George Lombardo testified that he had been incarcerated in Elmira since 1983. He described the preferred jobs and as to some of them, especially the housing block clerks, he testified that almost all of them were filled by whites during the first years after his arrival in 1983.

Morton VanAllen also testified concerning the preferred jobs. He testified that work on maintenance and in the cage floor area was a preferred job and that virtually all the inmates in those positions were white. Several other witnesses also testi

fied about their observances concerning the dominance of whites in the preferred jobs.

Perhaps the best evidence that there was a discriminatory tradition in the assignment of jobs was the fact that the prison administration conceded that there was a problem and made some attempt to rectify it. Obot's job as Inmate Program Placement Coordinator was to chair a three person committee that would place inmates in various work programs. He recalled that he attended a meeting with most of the top prison administrators during which Superintendent Ross advised them of this lawsuit and that because of it the jobs were to be monitored concerning their racial composition.

Obot was to monitor the ethnic balance of those jobs on the so-called premium list. This "premium list" contained those jobs traditionally preferred by inmates and was in existence prior to Obot's arrival. Obot determined that there was an ethnic imbalance as to the preferred jobs.

Obot testified that there was always tremendous opposition to his efforts to balance the ethnic makeup in the premium jobs by many of the corrections officers. This was especially the case with reference the clerk positions in the housing blocks. He testified that there were many attempts by guards to circumvent the directives of Obot as head of the IPPC. Obot's efforts were often thwarted by guards and other administrators who used tactics such as firing the inmate, not allowing the inmate to perform designated tasks or taking steps to transfer the inmate due to "security problems." Obot testified about three specific instances where guards refused to accept black inmates who were assigned to work in their area. At least two of these instances resulted in Obot, who is black, being subjected to racial harassment and intimidation by guards. One guard told Obot that "we don't like smart niggers" at Elmira. When Obot complained to a superior officer about one confrontation, the corrections guard in question later confronted Obot, cursed him, used racial epithets and brandished his night stick in a threatening manner. Although Obot com

plained to the Superintendent about this incident, nothing ever came of it as far as he knew.

In Obot's opinion, attempts by the administration to obtain some ethnic balance in the premium jobs would not have occurred except for the pendency of this lawsuit.

This resistance to Obot's efforts was exemplified by the actions of Officer Art Wichtowski, whom Obot testified opposed assignment of a minority to his area, the cage floor, "several times." *See* Tr. Volume 1A at 1001. Wichtowski would even pull white inmates from other assignments to work on the cage floor. *See Id.* at 1002. When Obot questioned Wichtowski, the latter responded with racial epithets. *Id.*

An example of Staff resistance to ethnic balancing is reflected in Obot's experience with Carol Griffith, Supervisor of the library. Griffith, whose library clerks were mostly white, even went so far as to tell an hispanic inmate, who was assigned by Obot and the Program Committee to be a clerk, to mop floors instead. Griffith told Obot flat out that she did not want hispanic workers in her area. *See* Tr. Volume 1A at 981–82. In her opinion, hispanic inmates steal books. *See Id.* at 1000.

Other officials at Elmira testified about Wichtowski's attitude and actions concerning blacks. Coleman testified about this and Richard Cerio, a Senior Corrections Counselor, admitted that he was aware that Wichtowski refused to accept blacks in his area, the cage floor, and that this area was consistently out of balance concerning racial makeup.

Cerio also testified at his deposition concerning staff influence over job assignments. At page 38 of his deposition, he described that, prior to greater involvement by the Program Committee, counselors would generally assign inmates in conformity with requests from staff. In Cerio's words, "people use [sic] to try to look for people that they wanted to hire." *Id.* at 36–37. In Captain Hollins' opinion, moreover, it was a "fact" that those in decision making positions were racially biased. *See* Ex. 71 at 23.

In addition to the anecdotal evidence and the admissions of prison officials that premium jobs were held more consistently by whites, there was substantial statistical evidence which was analyzed by Dr. Christensen that demonstrated the disparity between whites and minorities concerning assignment to the preferred jobs. These statistics, which were not rebutted by defendants, clearly demonstrate that whites did tend to receive the better or "premium" jobs to a greater extent than should have been expected based on their percentage of population.

Dr. Christensen's conclusion was that there was a consistent pattern of placing whites in the preferred jobs and that this occurred to a much greater degree than you would expect based on the whites relationship to the total inmate population.

Christensen randomly selected 42 dates from September 1985 through February 1988. In *every* instance, the proportion of whites holding premium jobs exceeded the proportion of whites to the overall prison population. For example, on September 6, 1985, whites comprised 18% of the prison population. Yet they were assigned 25% of the premium jobs. The next date analyzed, October 17, 1985, whites comprised approximately 17% of the population but received 28% of the premium jobs. On virtually every date examined from September 1985 through April 1987 the disparity was so great that in Christensen's opinion, it could not be attributed to chance.

Plaintiffs' statistical evidence of job discrimination, also depicts bias in the assignment of "premium" jobs. Dr. Christensen studied the ethnic distribution in the jobs that the prison administration itself characterized as "premium." He came to a definite conclusion that on all of the different dates examined, the proportion of whites holding premium jobs in relation to nonwhites exceeded the proportion of whites in the overall prison population.

Although the disparities observed on most of the dates examined after June 1987 did not appear statistically significant, Dr. Christensen testified that statistical insignificance does not rule out race as a factor in

decisionmaking, but rather simply increases the probability that the same situation could occur by chance. So, although an expert statistician, looking at a p-value of .25, could not rule out the possibility that the result occurred as a matter of chance, the expert still termed the one-in-four probability "fairly small." In other words, there is still a 75 percent probability that race was a factor in the result. *See* Tr. Vol I at 58.

Insignificance of a statistical finding may result either from the smallness of the sample size analyzed or of the disparity observed. What is notable about Christensen's statistics (Ex. 34a) is that for *every* date reported, the proportion of whites holding premium jobs exceeded the proportion of whites in the general population. Likewise, the relative numbers of non-whites holding these positions fell below their relative numbers in the prison.

In addition to presenting his own analysis, Dr. Christensen reviewed Exhibit 49, an affidavit prepared by a DOCS Program Research Specialist, Charles Nygard. Nygard did not testify at trial, but defendants submitted his affidavit in support of their pre-trial motion for summary judgment. Christensen concluded that Nygard's analysis also supported Christensen's opinion that the racial disparities in premium job assignments *were* statistically significant.[4]

Christensen conceded that toward the end of his sampling period, from June 1987 until February 1988, there was a smaller deviation between the assignment of whites and blacks and that he could not attribute statistical significance to that deviation, except for two instances in November 1987. In other words, the deviations during this time were small enough that they could have occurred by chance. Christensen stated, however, that the calculations were taken after the lawsuit had been commenced and the later figures did not change Christensen's opinion that over the course of time there has been a consistent, observable pattern of placing whites in pre-

mium jobs at the expense of minority inmates.

Bette Burke, a black woman, was employed at Elmira from February 1986 to May 1988 as a corrections counselor. For a brief period of one week, she observed the workings of the Inmate Program Placement Committee and during that time she believed that black inmates were assigned in a disproportionate number to the less desirable jobs. Burke testified that at the beginning of her tenure, the employee restaurant staff was probably completely without blacks, and that by April 1988 this had changed somewhat, although "it was still disproportionate, given the population." *See* Tr. Volume 1A at 770–71. She observed a similar pattern in maintenance crews, into which there might have been "one or two blacks" integrated later in her tenure. *See Id.* at 771. She characterized "highly visible" jobs (e.g., front lobby) as "all white," at first, with one black later added. *Id.* at 772.

Burke also testified about numerous instances where guards demonstrated racial animus toward inmates. She attempted to work with the administration and counsel several guards but without much success.

Burke also recalled several incidents of racial harassment directed towards her. On at least three occasions her prison mailbox was defaced with scurrilous, racial comments. On one occasion someone had penned a picture of a chimpanzee in her private bathroom with her name attached to it. She recalls the word "nigger" and the Ku Klux Klan initials, "KKK", placed on her mailbox at different times. She complained of these matters but nothing ever came of her complaint.

Roland A. Coleman was a black corrections officer at Elmira from 1957 until 1982. During most of his tenure at Attica, the preferable jobs in the commissary, maintenance and clerk positions were held by white inmates. During his stay he was one of only about eight black corrections officers out of a staff of approximately 430. He testified that the officer in charge of a particular housing block could take

---

**4.** Nygard's calculations also showed statistically significant racial disparities in inmate housing.

action to get particular inmates moved into a particular housing block.

A memorandum, dated February 22, 1984 from Richard Cerio to defendant, Deputy Superintendent McLaughlin, lists several problems that the Program Committee had with guards and staff concerning the centralized program assignment system. *See* Ex. 20. This memo documents Cerio's information that guards often thwart the Program Committee's decisions concerning program assignments. For example, if a guard's request to remove an inmate is denied, guards thwart the process by refusing to allow the inmate back to the work area, holding the inmate in his cell or charging him with repeated rules violations.

The ethnic balancing program, supposedly initiated to cure discrimination in preferred jobs appears not to have had any discernable effect until mid to late 1987. *See* Ex. 24 at 38, 44 and 467). Moreover, the balancing was only directed at jobs on the administration's preferred list, leaving discrimination to continue in other positions.

The defense offered testimony from several witnesses—Cheryl Lee who became the Inmate Program Placement Coordinator in 1990, Donald M. McLaughlin, the Deputy Superintendent at Elmira for Program Services from 1979 until 1987 and Richard Cerio—that there is now very rigid monitoring of the ethnic balance in the premium jobs. Lee testified that she prepares ethnic distribution reports on a weekly basis and that part of her job is to maintain ethnic balance in the premium jobs.

Defendants' own balancing reports, however, reveal that the employee restaurant, or "officers' mess hall," was largely staffed by white employees on various dates from September 1985 through October 1988. *See* Ex. 24; Defendants' Ex. F.

Various prison staff testified that certain jobs not on the prison's "preferred" list were racially unbalanced. Obot and Hollins stated that bakery jobs were disproportionately white. *See* Tr. Volume 1A at 970 (Obot); Ex. 71 at 25 (Hollins). Coleman

and Obot stated that clerical workers generally were mostly white. *See* Tr. Volume 1A at 974–75 (Obot); 935 (Coleman).

## C. Discipline

Elmira, as well as all New York state prisons, operates by a three-tiered disciplinary system. The system is set forth in a state directive and is codified in Title 7 of the New York Code of Rules and Regulations, Chapter 5, Sections A and B. Tier One infractions are the least serious, resulting in informal hearings, minor penalties and the destruction of records after 14 days. Rule violations at the Tier Two and Three level, however, are more serious, and involve formal proceedings which, if resolved adversely to the inmate, may result in a loss of privileges, keeplock or even loss of good time. The evidence at trial showed that any employee at the prison may write up an inmate for a disciplinary infraction; consequently, line staff retain great discretion in writing misbehavior reports.

Charles R. Page, currently the Deputy Superintendent for Security Services at the Southport Correctional Facility, testified that any employee at Elmira, uniformed or otherwise, is authorized to write a misbehavior report if he witnesses an inmate violating a prison rule. *See* Tr. Vol. IIA at 448–49.

The decision whether to write a report is left to the discretion of the employee. *See id.* Both Otu Obot and Superintendent Ross testified that the officer who witnesses the violation can personally decide whether to write a misbehavior report or simply warn the inmate. *See* Tr. Vol. II at 35 (Ross); Tr. Vol. IA at 997 (Obot).

DOCS Directive No. 4932, entitled "Chapter V, Standards Behavior and Allowances," specifically empowers employees not to report "minor" infractions. (Ex. 29, p. 4).

There was direct and circumstantial evidence that blacks tended to be disciplined more frequently than white inmates. This evidence was corroborated by significant statistical evidence that blacks were disciplined much more frequently than whites

according to their percentage of population. The defense did not produce evidence to rebut the statistics or the opinion of Dr. Christensen concerning the remarkable disparities concerning discipline of inmates.

Several of the inmates that testified at trial related anecdotal incidents where certain prison rules were enforced against minority inmates but were relaxed when whites committed the same infraction. *See, e.g.,* testimony of Juan Figueroa; testimony of Darryl Witherspoon.

This complaint by inmates concerning discriminatory practices relating to discipline was not novel to this lawsuit. Superintendent Miles testified that perhaps as far back as September 1984, but certainly by the time of this lawsuit, he had received inmate complaints about racial disparities in discipline. *See* Tr. Vol. IIA at 602–603. Corrections Captain Miles Barnes testified at his deposition that since he has been at Elmira (1981 or 1982) he heard many complaints from inmates that a guard or prison employee wrote up the inmate because of the inmate's race. *See* Ex. 74 at 118. Some administrators were clearly aware of the disparity. Former Superintendent Ross testified that he was aware that white inmates got fewer misbehavior reports than minorities. Tr. Vol. II at 35–36.

There was also testimony that the discipline system was abused at times to thwart administrative attempts to balance racially the job assignments. Otu Obot testified that, in some cases, officers would write misbehavior reports in what Obot perceived as an attempt to get an inmate fired from a job where the officer did not want him working. *See* Tr. Vol IA at 995–997. Sometimes, the misbehavior report would be issued immediately after Obot refused to grant the officer's request to have the inmate removed from the job. *See id.*

This practice was well known and documented. The memorandum of Senior Corrections Counselor Cerio to the defendant McLaughlin in February 1984, clearly sets forth several examples of how guards and staff thwarted the Program Committee's decisions concerning job assignments.

Doctor Christensen analyzed data compiled from the records of a sample of inmates at the prison. At Christensen's direction, one out of every four inmates was analyzed from the cell books for March of 1985, 1986 and 1987 and July of 1988. Exhibit 37 is a table that Christensen prepared concerning this data. Doctor Christensen also controlled for differences in length of stay by computing the average number of reported incidents per month for each race.[5]

Christensen testified to enormous statistical disparities in the number of misbehavior reports received by black, hispanic and white inmates. Exhibit 37 shows that white inmates received 2.99 incidents per individual, while blacks had 4.87 incidents per inmate, a ratio of 1.63. According to Christensen, the disparity was remarkably high with a deviation of .0000010. It was impossible for that to occur by chance. The hispanic-white disparity of .000078 was also significant.

Additionally, plaintiffs' statistics showed that minorities were more likely to receive punishment in more severe categories (e.g., keeplock, SHU, lost good time) for infractions than were whites. Further, minorities were more likely to receive slightly longer sentences (e.g., in keeplock) on average than white prisoners. *See* Exhibits 40, 41.

Deputy Superintendent Page testified that, following the receipt of the complaint in this action, which plainly alleges discrimination in discipline at Elmira, his inquiry into the matter consisted of a daily review of individual Tier 2 dispositions, with an eye toward deciding in a given instance whether the punishment appeared race-related. *See* Tr. Vol. IIA at 460. There is no evidence that he undertook a more systematic investigation and he testified that he was not aware of any racial disparities in discipline at the prison. *Id.* at 461. Superintendent Miles testified similarly with regard to Tier 3 dispositions. *See* Tr. Vol.

---

**5.** Moreover, the data showed that blacks on the average stay at Elmira for shorter periods than do whites, making the disparity among average number of incidents even more remarkable.

IIA at 603. Superintendent Bartlett testified that he has not looked systematically at racial discipline patterns within the prison. *See* Tr. Vol. IIA at 726.

## II. CONTENTIONS OF THE PARTIES

There are four main areas of dispute between the parties. The first is, of course, the substantive matter of whether plaintiffs have proven their case of discrimination by a preponderance of the evidence. Defendants maintain that the evidence is insufficient to support plaintiffs' claim of racial discrimination in violation of § 1983. Plaintiffs, on the other hand, maintain that the proof clearly establishes a pattern of racial discrimination in housing, jobs and discipline.

The other three disputed areas relate to issues of standing, mootness of the claims and the scope of the defendants' liability.

First of all, defendants contend that the entire class action should be dismissed because the named plaintiffs were not proper representatives of the class. Defendants claim that because the named plaintiffs did not prove that they personally suffered discrimination, the entire class action should be dismissed.

Defendants also contend that there is insufficient proof to support a finding of liability against the individual named defendants, former top officials at Elmira. Defendants maintain that there is no proof that the individual defendants caused the discrimination complained of and, in any event, since they are no longer employed at Elmira, injunctive relief against their successors would be inappropriate.

Finally, defendants essentially argue now, as they did in their pre-trial motion for summary judgment, that this case is moot. Defendants contend that even if there were instances of discrimination that existed at the time this suit was commenced, prison officials have acted to correct this discrimination, especially concerning job assignments and housing placements. Plaintiffs, on the other hand, maintain that the action is in no sense moot. They maintain that changes, if any, have not been thorough or effective and there is

ample reason for injunctive relief to guarantee that past practices do not reoccur.

## III. DISCUSSION

### A. Standing

The defendants claim that plaintiffs lack standing because, of the three named plaintiffs who testified at trial, Aaron Mays, Mark Steele and Jeremiah Smith, not one proved that he, individually, had suffered discrimination in job assignment, housing or discipline. Citing, *inter alia*, the Supreme Court's decision in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), defendants contend that if the named plaintiffs cannot show standing to sue as individuals, neither can they sue as representatives of a class and, therefore, the Court must dismiss both the individual and class claims.

Because I believe that defendants misapprehend the doctrine of standing concerning class representatives, I reject defendants' contention that plaintiffs' claims must now be dismissed due to a lack of standing on the part of some of the class representatives.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.... The concept of standing is part of this limitation." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37, 96 S.Ct. 1917, 1923, 48 L.Ed.2d 450 (1976) (citation omitted). The question of standing, simply stated, is "whether the litigant is entitled to have the court decide the merits of the dispute ..." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The principle has constitutional aspects as well as practical ones.

To establish standing, a litigant must show actual or threatened injury, fairly traceable to action by the defendants, which is redressable by court action. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472,

102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The plaintiff must possess "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The principle, of course, must be applied in class action cases as well as in individual cases. The Supreme Court has held, in the class action context, that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675.

· Defendants claim that the named plaintiffs have no standing to represent the class because they did not establish at trial that any of them suffered discrimination. Defendants assert that, as in the case of *Foster v. Center Tp. of Laporte County*, 798 F.2d 237 (7th Cir.1986), the named plaintiffs in this action *never* had standing to sue on their own behalf, because they did not suffer discrimination at the hands of the defendants. Defendants further rely on *Simon, supra*, which denied standing on the ground that, although the plaintiffs had asserted injury, they had not alleged facts that tied that injury to unlawful acts by the defendants.

I believe that there is no basis to dismiss this suit because of a lack of standing. I believe that defendants confuse standing to bring the action with the ultimate merits of the case.

■ It is axiomatic that inquiry into a plaintiff's standing is independent of the merits of the claim; standing is determined as of the pleading stage. *See Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (standing in no way depends upon the merits of the plaintiff's contentions); *Baker*, 369 U.S. at 204, 82 S.Ct. at 703 (question of standing is whether plaintiffs have "alleged" personal stake in litigation); *Harmsen v. Smith*, 693 F.2d 932, 942 (9th Cir.1982) (standing ordinarily not dependent on merits of case but

on whether plaintiff alleges injury as a result of defendant's conduct), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *O'Hair v. White*, 675 F.2d 680, 696 (5th Cir.1982) (decision concerning standing based on pleadings viewed in light most favorable to plaintiffs); *see also* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure*, § 3531 (2d ed.1984).

■ The failure of the named plaintiffs in a class action to prove their individual claims on the merits at trial does not deprive the class retroactively of standing to maintain the lawsuit. Rather, as the Supreme Court has determined:

> [P]rovided the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims.

*East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 (1977). *See also Gibson v. Local 40, Supercargoes and Checkers of Int'l Longshoremen's and Warehousemen's Union*, 543 F.2d 1259, 1263 (9th Cir.1976). (Failure of proof as to named plaintiffs would not bar maintenance of the class action).

The issue concerning the failure of the named plaintiffs' claims on the merits is not dissimilar to questions of mootness. In the class action context, the Supreme Court has held that, once a class is properly certified, the subsequent mootness of a named plaintiff's claim does not require dismissal of the entire class action. *See Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *See generally*, 1 *Newberg on Class Actions*, § 2.28 (2d ed.1985).

■ There can be no dispute that the named plaintiffs here, having alleged their membership in a cognizable, racial group within the prison, demonstrated the "personal stake in the outcome of the controversy" necessary to establish their standing to assert job and housing discrimination claims on behalf of that group. *See Cousins v. City Council of City of Chicago*, 466

F.2d 830, 845 (7th Cir.), *cert. denied*, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151 (1972). This case is unlike *East Texas Motor Freight*, where plaintiffs, who sought to challenge their employer's policy precluding them from transferring to certain jobs, were held to lack standing because they were not qualified for the jobs in the first place. Here, minority prisoners as a group would be able to obtain preferred jobs and housing but for the challenged conduct. Had plaintiffs not been incarcerated at Elmira when they commenced the action, they might lack standing to the same extent that the plaintiffs in *East Texas Motor Freight* were deemed to lack standing. To the contrary, however, the named plaintiffs in this case faced very real and direct injury if discrimination in housing, jobs and discipline persisted.

Accordingly, I find that the named plaintiffs in this case had standing to seek relief on behalf of the entire class represented. *See O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675. I hereby decline to dismiss the class claims.

## B. Liability of Named Defendants

Defendants claim that plaintiffs' complaint should be dismissed because plaintiffs have failed to show any liability on the part of the named defendants. These defendants claim that there is no proof that they were personally responsible for any acts of discrimination. Even if plaintiffs have established some acts of discrimination by lower-level employees at Elmira, those acts cannot be attributed to the named defendants, Miles, Novak and McLaughlin.

Defendants claim that plaintiffs' complaint must be dismissed because plaintiffs have failed to establish a causal link between the discriminatory acts and each of the named defendants. Relying on *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), defendants claim that plaintiffs' complaint must be dismissed because it seeks to impose liability on defen-

dants for acts of subordinates and that such liability may not be imposed in § 1983 actions on a theory of *respondeat superior.*

The flaw in defendants' argument is that plaintiffs do not seek merely to impose liability vicariously because of the acts of subordinates. Rather, plaintiffs seek to impose liability on defendants for their own acts, their own personal involvement in the discrimination.

*Rizzo*, like *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) stands for the principle that § 1983 liability will not attach vicariously by virtue of defendants' relationship with the actual wrongdoer. *See also Arthur v. Nyquist*, 573 F.2d 134, 139 (2d Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). Under this well-established principle, the defendants' *own* conduct must be shown to have caused the harm suffered by plaintiffs.

In short, plaintiffs must establish the "personal involvement" of each of the named defendants. The standards for establishing this involvement are well established in this Circuit.

In the case of *Williams v. Smith*, 781 F.2d 319 (2d Cir.1986), the court reversed the district court's grant of judgment in favor of the Superintendent of Attica in a suit brought under § 1983 by a prisoner who alleged a violation of due process in his disciplinary hearing. The court found that the Superintendent's affirmance of the result of the unconstitutional proceeding created the requisite personal involvement to support § 1983 liability.

The court detailed the many ways in which a plaintiff could establish the necessary causal link. First, the defendant's direct participation in the event could create liability. Second, the defendant after learning of the violation, may fail to correct the wrong.[6] Third, a supervisor may be

---

**6.** Clearly, this does not conflict with the portion of *Rizzo* in which the Court rejected the notion that mere failure to correct a pattern of abuse could result in liability absent proof linking the defendant with the violation in the first place. The holding in *Williams* contemplates the failure of the supervisor-defendant to take steps *despite his knowledge* of the violation.

liable for creating a policy or custom under which unlawful practices occur, or for allowing such a policy or custom of which he is aware to continue. Finally, a plaintiff may prove liability by showing that the supervisor acted with "gross negligence" in managing the subordinates personally involved in the unlawful conduct or event. *See* 781 F.2d at 323.

■ Under the test established by *Williams,* I find personal involvement of the named defendants sufficient to impose liability.

The evidence shows that many in authority at Elmira were aware of the disparity between whites and blacks in some of the housing units, especially the Honor Block, and in some job assignments.

Defendant Miles testified that in 1985, after a complaint by an inmates group, he noticed an imbalance of whites in certain jobs but he made no inquiry as why that was so. He admitted that it might have been suggested that supervisors favored whites but he did not investigate that allegation either. Miles also conceded that there were more whites in the smaller blocks and that he attempted to rectify this, after commencement of this lawsuit, by assigning housing on the basis of jobs or programs. Although aware of these discrepancies, Miles never monitored the housing concerning the racial mix.

Defendant McLaughlin was the First Deputy Superintendent for programs at Elmira from 1979 until 1987. He claimed that he was unaware of any claim of discrimination in jobs until the Inmate Liaison Committee meeting and complaint of August 1985. He attempted to balance the preferred job list after that time. Although he understood that there was imbalance in some areas, he never attempted to find out why the discrepancies had occurred.

I find as a fact that defendants Miles, McLaughlin and Novak, as the highest prison officials at Elmira, had actual or constructive notice of the disparities between whites and minorities in housing, job placement and discipline. The proof was clear. Inmates had complained about the discrimi-

nation and many high-level prison officials were cognizant of racial disparities. Superintendents Ross and Miles admitted that they noticed racial disparities in the programs that they were charged with managing and supervising. Many witnesses testified that it was an established "tradition" that certain jobs and certain housing blocks were reserved for whites. This was well-established.

Liability is not premised on a *respondeat superior* theory. Proof shows that there is sufficient personal involvement of the three named defendants who were the three top administrators at Elmira. All three had actual or constructive notice of the alleged constitutional violations concerning racial discrimination in housing and job assignments and they failed to adequately eliminate the violations. *See Murray v. Koehler,* 734 F.Supp. 605, 607 (S.D.N.Y.1990); *Anderson v. Sullivan,* 702 F.Supp. 424, 428 (S.D.N.Y.1988); *Johnson v. Commissioner of Correctional Services,* 699 F.Supp. 1071, 1075 (S.D.N.Y.1988).

Furthermore, as the top officials in the prison, defendants are charged with condoning the procedures that allowed racial disparities to flourish. *Langley v. Coughlin,* 709 F.Supp. 482, 486 (S.D.N.Y.1989). The Superintendent and his top executive team are ultimately responsible for the practices and procedures that are implemented under their direction concerning inmate housing and program assignments. Ultimate responsibility for these practices constitutes sufficient personal involvement to impose liability on defendants. *Williams v. Smith, supra,* 781 F.2d at 323–34; *see Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989).

Liability is established not because of acts of subordinates but because of the defendants' own conduct. Specifically, liability is imposed for their " 'gross negligence' and 'deliberate indifference' to the constitutional rights of inmates ... as indicated by their knowledge that unconstitutional practices were taking place, and their failure to act on the basis of this information." *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983).

The top administrators at the prison cannot acquiesce in practices and procedures that result in serious constitutional violations. *See Villante v. Dep't of Corrections of City of New York,* 786 F.2d 516, 519 (2d Cir.1986). In light of the evidence that was obvious to see, defendants had a duty to investigate and take steps to correct any constitutional violations perpetrated by subordinate prison officials. *See Eng v. Coughlin,* 684 F.Supp. 56, 65–66 (S.D.N.Y.1988).

Defendants are all charged with knowledge of the constitutional violations that occurred over a period of several years. Allowing such a policy and custom to continue constitutes the requisite personal involvement and subjects defendants to liability under § 1983. *Williams v. Smith, supra,* 781 F.2d at 323. Furthermore, defendants are liable for their gross negligence in "managing" subordinates who perpetuated the discriminatory customs concerning jobs, housing and discipline.

Defendants also claim, albeit with very little discussion (defendants' post-trial brief at 92) that the complaint should be dismissed because the proof failed to establish that defendants acted pursuant to a policy or pattern of discrimination. Relying on language from *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), defendants claim that the defendants, sued in their official capacities, are not liable unless the Court finds that defendants acted pursuant to such a policy or custom.

Defendants' argument is without merit for several reasons. *Kentucky v. Graham* was not a case involving injunctive relief against state officials for violations of federal law. The underlying action was a claim for damages and the decision related to defendants' responsibility for attorneys fees in such an action.

■ It is well-established that one cannot sue a state or a state official in his official capacity for damages because of the Eleventh Amendment and the principle of sovereign immunity. It is, however, equally well-established that the Eleventh Amendment does not bar an action for prospective, equitable relief against a state official who is charged with violating federal law. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984).

The Supreme Court and other federal courts have recently reaffirmed the principle that a state agent may be sued in his official capacity if the plaintiff merely seeks injunctive or prospective relief of a legally cognizable federal claim. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 2311, n. 10, 105 L.Ed.2d 45 (1989); *Nix v. Norman,* 879 F.2d 429, 432 (8th Cir.1989).

The present action is not an action for money damages. Plaintiffs seek prospective relief only and request that the Court enjoin the named state officials from violating the Equal Protection Clause of the Constitution.

An action brought pursuant to *Ex parte Young,* is not deemed to be an action against the state. The fiction of *Ex parte Young* is that an officer who acts contrary to federal law acts without authority and therefore, under such circumstances, he does not act in a representative capacity. *Id.,* 209 U.S. at 160, 28 S.Ct. at 454. Clearly the *Ex parte Young* doctrine "rests on the need to promote the vindication of federal rights." *Pennhurst State School & Hospital, supra,* 465 U.S. at 105, 104 S.Ct. at 910.

The argument made by defendants here was rejected by the Ninth Circuit in *Chaloux v. Killeen,* 886 F.2d 247 (9th Cir.1989). In that case, the court determined that a county sheriff was a proper party defendant under *Ex parte Young* in an action to enjoin enforcement of the state's post-judgment garnishment procedures. The action for injunctive relief was proper under *Ex parte Young,* and the court rejected the notion that under *Monell,* or *Kentucky v. Graham, supra,* defendants would only be liable if the constitutional violation were inflicted pursuant to an official policy of the county. Because the action was not for damages but only for injunctive relief, the

court in *Chaloux* held that the *Monell* principles concerning municipal liability for damages simply did not apply. The court held that the *Monell* doctrine did not limit plaintiff's ability to sue to enjoin state officials from the continued violation of constitutional rights. *Chaloux, supra,* 886 F.2d at 251.

The defendants in this case were the top administrators at Elmira. Plaintiffs have convinced me that these officials were responsible, under *Williams v. Smith* principles, for the federal law violations relating to discrimination at the prison. As such, under *Ex parte Young,* plaintiffs properly sued these officials to enjoin the constitutional violations.

## C. Mootness

### 1. *Prison Policy Changes*

The defendants contend that injunctive relief is no longer appropriate because the issues in the case have become moot. In essence, defendants claim that, even if there were problems with discrimination in the past, these problems have all been rectified, in part because of the pendency of this lawsuit. Defendants contend that there is no basis for court intervention at this time.

Defendants moved for summary judgment on this ground as well. At that time, I rejected the argument and after the proof that I have considered at trial, I see no reason to change that prior determination.

Under well established principles concerning mootness, I believe that in spite of some changes that have been made by defendants to remedy problems of discrimination, federal court intervention is required under the facts of this case.

A case becomes moot "when the issues are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). As a general matter, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's*

*Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). Many of the changes in policy occurred subsequent to commencement of this lawsuit. There is no doubt that some of the changes were implemented solely because of the pendency of this action.

> It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption.

*United States v. Oregon Medical Soc.,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952).

Although some very positive steps have been taken by current administrators, that does not by itself defeat the court's power to issue injunctive relief. "Mere voluntary cessation of allegedly illegal conduct does not moot a case; ... a case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).

In cases involving challenges to prison practices, federal courts in this Circuit have not been reluctant to issue injunctive relief in spite of substantial voluntary improvements by prison officials. *See Eng v. Smith,* 849 F.2d 80, 83 (2d Cir.1988); *Fisher v. Koehler,* 692 F.Supp. 1519, 1565–66 (S.D.N.Y.1988).

The test for mootness in cases such as this is a "stringent" one, with the burden resting heavily on the defendant to prove the absence of a likelihood that the illegality will recur. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Jones v. Diamond,* 636 F.2d 1364, 1375 (5th Cir.1981), *overruled on other grounds, International Woodworkers of America v. Champion Int'l Corp.,* 790 F.2d 1174 (5th Cir.1986) (*en banc*).

In *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), the Supreme Court held that

jurisdiction, properly acquired, may abate if the case becomes moot because

(1) it can be said with assurance that "there is no reasonable expectation .." that the alleged violation will recur ... and

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

Under this strict standard, defendants have not convinced me that this case is moot and that the Court should decline further involvement in spite of plaintiffs' proof that serious discriminatory acts occurred in the past.

There was some testimony at trial concerning the remedial measures that defendants have taken to rectify discrimination in housing and in jobs.

Richard Cerio, a Senior Corrections Counselor, testified that as of 1984, responsibility for program assignments shifted away from counselors and entirely into the hands of the Inmate Program Placement Committee, a centralized body. He also testified that beginning in 1985, he monitored the ethnic breakdown in preferred jobs and eventually received a directive to see that racial balance was maintained.

Cheryl Lee, testified that she succeeded Obot as the Inmate Program Placement Coordinator. She testified that she now produces a weekly ethnic distribution report on preferred jobs.

Neil Galpin, the Inmate Movement Locator, testified that he is now in the process of balancing the Honor Block by attrition. When a white inmate leaves the block, he is replaced by a minority inmate. David Post, a Senior Corrections Counselor, also testified about changes in the Honor Block and he claimed that the criteria, besides race, for admission to D Block have been simplified in order to make them more objective.

With regard to housing assignments generally, former Superintendent Miles testified that he initiated the practice of housing inmates according to job assignment at

approximately the same time that he began monitoring the ethnic balance of jobs.[7]

Plaintiffs claim that remedial measures taken as a result of prisoner complaints and this lawsuit have been largely ineffective and that, in any event, given the racial animus that still pervades the prison, conditions are likely to revert to the deplorable state that existed before this action was commenced.

Plaintiffs' evidence that discrimination continues at Elmira persuades the Court that defendants may not easily escape injunctive relief by instituting some half-hearted reforms in response to this litigation.

The plain truth is that disparities continue to exist in all three areas of concern—housing, jobs and discipline.

Defendants have not met their heavy burden of showing that reforms currently in place have "irrevocably eradicated the effects" of past violations. *See County of Los Angeles v. Davis, supra,* 440 U.S. at 631, 99 S.Ct. at 1383. Rather, there is evidence in the record indicating that demonstrated violations are likely to recur.

Particularly with respect to housing, plaintiffs' statistics demonstrate that until virtually the date of trial racial disparities continued so that white inmates were more often housed in the preferable housing blocks. *See* Exhibits 32, 33. These statistics speak far louder than defendants' claims that changes at the prison render this case moot.

Anecdotal evidence also shows that lower-level officers continue to influence the location of inmates, which certainly has the potential to disadvantage minority inmates. For example, inmate Morton Van Allen testified that in 1989, five days after being told by Officer Hollenbeck that the latter would get Van Allen's "fat nigger ass out of [C Block]," he was moved from that block.

The statistical evidence concerning the effectiveness of job reform is not entirely conclusive. Exhibit 34a shows that since

---

**7.** The gist of Miles' testimony, however, is that this decision was motivated more by security concerns than by a desire to eradicate discrimination.

June 1987, although whites still received preferred jobs to a greater degree than their relationship to total population, the deviation was not deemed to be statistically significant. Yet, this does not tell the whole story. Evidence at trial revealed that certain jobs considered preferable by inmates did not make the "premium" list created by the defendants. Such assignments include clerical jobs in all areas, maintenance jobs and bakery jobs. There is no balancing program in place with respect to these jobs; consequently there is no reason to believe that discrimination in those areas has abated or will abate in the future.

Furthermore, trial testimony showed that the fundamental cause of much of the discrimination in jobs and programs, that is, staff opposition to and manipulation of minority programming assignments, remains a problem. The testimony of Otu Obot, much of which focused on this issue, concerned instances he observed during his tenure as Inmate Program Placement Coordinator, which lasted until late 1989.

There was other evidence that, in spite of the balancing that was supposed to be made by the Inmate Program Placement Committee, inmates were still assigned jobs and programs outside of this system. For example, inmate Robert Rivera testified that two weeks prior to trial, he had observed a white inmate who was not assigned to maintenance performing that work. Terrence McMichael's unfortunate encounter with Officer Wichtowski, discussed above, occurred in May 1988.

So long as lower level officers remain able to unilaterally circumvent centralized programming procedures, the danger exists that past wrongs will recur.

The discrimination at issue here is not of recent origin. It has existed and continued for years. In view of the nature of this problem, the fact that changes have occurred very slowly, and the demonstrated resistance of some in authority to follow directives concerning ethnic balancing, I believe that this case is not moot. Under this state of facts, defendants have failed to carry their heavy burden of proving that the challenged illegality will not continue or, where corrected, will not recur. *See Green v. McCall*, 822 F.2d 284, 293 (2d Cir.1987); *Jones v. Diamond, supra*, 636 F.2d at 1375.

### 2. *Mootness Because of Prison Personnel Changes*

■ Defendants contend that this Court should not enjoin the current Superintendent and Deputy Superintendents of Programs and Security because there is no evidence that those currently in office will continue the practices of their predecessors. Defendants rely principally on *Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). That case involved a suit against the mayor of Philadelphia to enjoin him from discriminating in selecting candidates for a city school board nominating panel. While the case was pending before the Court of Appeals following entry of an injunction by the District Court, a new mayor took office. Nevertheless, the Court of Appeals ordered extensive injunctive relief against the new mayor.

The Supreme Court reversed, holding that

> where there have been prior patterns of discrimination by the occupant of a state executive office but an intervening change in administration, the issuance of prospective coercive relief against the successor to the office must rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor.

415 U.S. at 622, 94 S.Ct. at 1334. Because the District Court had made no such supplemental findings, the Supreme Court found that the Court of Appeals had erred in enjoining the conduct of the new mayor.

Defendants further rely on the case of *American Civil Liberties Union of Mississippi v. Finch*, 638 F.2d 1336 (5th Cir. 1981). There, the Court of Appeals held that a court should not exercise its discretion to issue injunctions against successors in office without a "strong factual basis" for concluding that they would continue the

illegal conduct. *Id.* at 1345. Construing the complaint, the Court found no allegations that would allow such a conclusion; rather, although the complaint generally alleged an ongoing pattern of violations that began before the original defendants even took office, it contained no specific allegations involving any but the original defendants themselves. *Id.* Nevertheless, the Court granted the plaintiffs leave to amend their pleadings.

Both *Mayor of the City of Philadelphia* and *Finch* are distinguishable from this action. This case does not involve separate acts of one or a few individuals. The conduct complained of in this case is not personal to certain individuals. That was the case in *Mayor of the City of Philadelphia.* There, a single individual was involved in a pattern of repeated constitutional violations. When he left office, there was no indication that his illegal acts did not leave with him. In other words, there was no proof that his successor would continue the discriminatory practices.

*Finch* is not controlling because there the complaint was dismissed because plaintiff failed to allege facts that would warrant relief against the current officials. The court did allow amendment of the complaint so that those facts could be properly pleaded.

In this case, however, the Court has heard extensive testimony that the discriminatory acts at issue continued during the terms of several Superintendents. The systemic procedures were not personal to any one official but have pervaded the institution for many years. Plaintiffs do not complain about isolated acts of a few individuals. Rather, they complain that there is a widespread practice and custom of discrimination that is enforced and condoned by *whomever* is in charge at Elmira. There is no indication from this record that the alleged constitutional violations were isolated incidents caused by a few individuals. Even during the pendency of this lawsuit, the discriminatory patterns have continued. Unlike the situation in *Mayor of the City of Philadelphia,* the challenged discriminatory practices continued regardless of the change in administrators.

The problems of discrimination will be eradicated only if top officials at Elmira are under a directive to eliminate practices and procedures at the prison that result in the denial of equal protection to black and hispanic inmates.

Under circumstances such as this, there is ample authority to grant injunctive relief against the current Superintendent, regardless of whether he was originally a named defendant, in order to ensure proper relief to the plaintiff class. *See Hoptowit v. Spellman,* 753 F.2d 779, 782 (9th Cir.1985) (findings concerning institutional practices and physical conditions at prison, rather than "idiosyncratic abuses of the particular members of the outgoing administration," provide the facts "from which the continuation of the dispute is a reasonable inference"); *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners,* 622 F.2d 807, 823 (5th Cir.1980) (allegations of pattern of discrimination spanning several jury commissioner administrations, along with allegations that incumbents will follow practices of predecessors, sufficient to defeat motion to dismiss on grounds of mootness), *cert. denied,* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981); *Haffer v. Temple University,* 678 F.Supp. 517 (E.D.Pa.1987) (change of university president along with meaningless changes in administration of university athletic programs, does not dispel inference that historically discriminatory institutional practices will continue).

Under these circumstances, it is clear that a change in administrations has not and will not likely change the deeply ingrained pattern of discrimination that has existed at this prison for many years. Under these circumstances, the case is not moot and injunctive relief may be entered against the defendants' successors.

D. Merits of the Case—Proof of Discrimination

■ As fact-finder in this non-jury case, I must determine if plaintiffs have proved their case by a preponderance of the evi-

dence. Plaintiffs need not prove discrimination to a scientific certainty but rather by a preponderance of the evidence. If the Court can conclude that it is "more likely than not" that impermissible discrimination exists, then plaintiffs are entitled to prevail. *See Bazemore v. Friday*, 478 U.S. 385, 400–401, 106 S.Ct. 3000, 3008–3009, 92 L.Ed.2d 315 (1986). The Court must view all the evidence, both direct and circumstantial, and make judgments concerning the credibility of witnesses.

In my judgment, plaintiffs have established clear violations of the Equal Protection Clause of the Fourteenth Amendment. The evidence paints a clear picture. Race was a factor—an important factor—at Elmira in determining matters of importance, including the housing, the employment, and the discipline of inmates. Because of their race, blacks and hispanics received less favorable treatment than whites concerning job and housing assignments and were disciplined more often and more severely than white inmates.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). It is *always* improper for state officials to make decisions based on the race of those affected by their decisions.

As a general matter, "[p]risoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). "[A]bsent a compelling state interest, racial discrimination in administering prisons violates the Equal Protection Clause." *Black v. Lane*, 824 F.2d 561, 562 (7th Cir.1987). Although certain rights and privileges of necessity must be lost when one enters the prison system, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Id.*

It is by now well-settled that disparate racial impact alone will not support a finding of a violation of the equal protection clause. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 493, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). In order to establish a violation, plaintiffs must prove not only discriminatory effect, but also that a racial motive was responsible for that effect. *See id.* Moreover, "[a] person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Huebschen v. Dep't of Health and Social Services*, 716 F.2d 1167, 1171 (7th Cir.1983).

In addition to disparate impact, proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563.

Discrimination need not be the sole purpose for the action. It is enough if plaintiffs show that a discriminatory purpose was a "motivating factor" in the administrative decision. *See Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563; *Hunter v. Underwood*, 471 U.S. 222, 225, 105 S.Ct. 1916, 1918, 85 L.Ed.2d 222 (1985).

Plaintiffs must prove that there was a discriminatory purpose behind the state action. Direct evidence of this is often unavailing. Most often, the proof is based on circumstantial evidence including statistical evidence of racial disparity. The Court may consider any relevant circumstantial proof that tends to show that the state acted with a discriminatory motive.

Although disparate impact alone is not sufficient to raise a *prima facie* case, the Court can certainly consider the impact on minorities of official conduct as circumstantial evidence of discriminatory intent. Evidence of such an impact may provide the "starting point" for any examination and analysis of discriminatory motive. *Ar-*

*lington Heights,* 429 U.S. at 266, 97 S.Ct. at 564.

▪ In determining intent, the Court can also consider the historical background or context that existed at the time the challenged actions were made. *See McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20, 107 S.Ct. 1756, 1770 n. 20, 95 L.Ed.2d 262 (1987); *Hunter v. Underwood, supra,* 471 U.S. at 225, 105 S.Ct. at 1918; *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. Even facially neutral actions can be considered discriminatory if the historical background suggests that the true purpose was to discriminate against a class. *See Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886).

In Equal Protection cases alleging discrimination on account of race, statistical evidence has long been considered crucial in proving discriminatory intent. *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563; *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *see McCleskey,* 481 U.S. at 293–94, 107 S.Ct. at 1767–68.

▪ Such statistical proof together with other evidence can prove discriminatory intent and establish a *prima facie* case. In fact, in some cases statistical evidence alone may establish a *prima facie* case. *Hudson v. Int'l Business Machines Corp.,* 620 F.2d 351, 355 (2d Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). If statistics are to be considered as the sole basis for inferring discriminatory motive, the disparity between the compared groups must be so large and significant that such disparity could not be caused by chance. *McCleskey,* 481 U.S. at 293–94, 107 S.Ct. at 1767–68; *Castaneda,* 430 U.S. at 494 n. 13, 97 S.Ct. at 1280 n. 13; *Arlington Heights,* 429 U.S. at 265–66, 97 S.Ct. at 563–64; *Hillery v. Pulley,* 563 F.Supp. 1228, 1238–39 (E.D.Cal.1983), *aff'd,* 733 F.2d 644 (9th Cir.1984), *aff'd,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

▪ This was made very clear in *Castaneda* where the Supreme Court stated that:

> If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process.

430 U.S. at 494, n. 13, 97 S.Ct. at 1280, n. 13. Under factual circumstances such as this, the burden shifts to the state to "dispel" the inference of intentional discrimination. *See Castaneda,* 430 U.S. at 495 and n. 14, 97 S.Ct. at 1280 and n. 14.

Through the testimony of Dr. Christensen, the plaintiffs introduced evidence of gross statistical disparities in housing, program assignments and discipline within the prison. Christensen's analysis revealed that the proportion of whites housed in the smaller, cleaner, safer cell blocks exceeded the relative proportion of whites in the general prison population to an extent that was statistically significant.[8] Further, he testified that similar disparities were apparent with respect to programming assignments, although the statistical significance of these results was not as great as was the case with the housing study.[9] Spe-

---

**8.** Defendants contend that H block should not have been analyzed along with the other smaller housing areas, because admission to this block depends upon whether an inmate meets very specific mental health-related criteria. This argument rings hollow, however, because it ignores the fact that the statistical analysis shows H block by itself to be the most disproportionately white block in the prison. Moreover, pointing out that inmates had to meet mental health criteria to gain admission to H block does not begin to explain the obvious racial disparity among its residents.

**9.** As pointed out above, plaintiffs' exhibit 34a reveals that for roughly half of the dates analyzed with respect to premium jobs, the observable disparity between white and minority inmates was not statistically significant. Although this reduces somewhat the probative value of the analysis, it does not wholly devalue it. The lack of significance of the findings for specific dates is overcome by the fact that a visible, although not necessarily significant, disparity occurs for *every* date analyzed. *See Barnes v. Gencorp Inc.,* 896 F.2d 1457, 1468 (6th Cir.) (in ADEA case, "while the statistical disparity for any one group would not be significant because of the sample size, it remains significant that the older employees were discharged in each of

cifically, the expert found that many of the "preferred" jobs, including runners, cage floor workers, maintenance and others, were disproportionately staffed by whites.

Dr. Christensen's testimony was the only significant statistical evidence in the case. As fact-finder, I find his testimony entirely credible and his results sound. I believe, by any standard, that these statistics show dramatically the favoritism by the prison administration toward whites and against minorities, especially blacks, in job placement and housing assignments. They also show a clear pattern that blacks were disciplined to a far greater extent than were white inmates.

Furthermore, I find that the discrepancies were so great that they could not be explained by chance or some other benign reason. In Dr. Christensen's opinion, these differences can only be accounted for on the basis of the race of the inmates. I agree.

Federal cases have recognized that statistical differences greater than two or three standard deviations provide an acceptable basis to infer discrimination. *Castaneda*, 430 U.S. at 498 n. 17, 97 S.Ct. at 1281 n. 17; *Rendon v. AT & T Technologies*, 883 F.2d 388, 397–98 (5th Cir.1989); *Hillery*, 563 F.Supp. at 1244. Of course, no bright-line rule concerning "standard deviations" can apply to all situations. The "significance" or "substantiality" of any numerical disparities must be evaluated in light of the facts of each particular case. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2789 n. 3, 101 L.Ed.2d 827 (1988).

Most of Dr. Christensen's conclusions were based on deviations well in excess of two standard deviations. Especially as to housing and job assignments prior to 1987, the deviations were so great that Christensen was of the opinion that it was virtually impossible that the results could have been obtained by chance.

Christensen's evidence and his conclusions stand unrebutted because the defendants presented no other expert statistical evidence to contradict Christensen. In that posture, I certainly am at liberty to accept Christensen's expert testimony and his conclusions. *See Hillery*, 563 F.Supp. at 1242. Based on this evidence alone, I believe that plaintiffs have established a *prima facie* case and defendants have failed to carry their burden to dispel the inference of intentional discrimination. *Castaneda*, 430 U.S. at 494–95, 97 S.Ct. at 1280–81.

In their post-trial brief, defendants dispute the validity of Dr. Christensen's statistical analyses, and request that his testimony be disregarded by the Court. Defendants characterize his analysis as result-oriented and calculated to yield results favorable to the plaintiffs by excluding certain variables that would render the statistical disparities less significant. Defendants' criticisms range from the most fundamental, that Dr. Christensen failed to account for the relationship between housing placement and program assignment, to the trivial, that in a few instances he rounded percentages up where he should have rounded down.

■ As a general matter, courts look with disfavor upon a party's attempt to discredit statistical evidence by charging that the analysis fails to control for certain race-neutral factors, when that party offers no expert or statistical evidence showing that the excluded factors, *if* accounted for, would materially vary the significance of the challenged evidence. *See Bazemore*, 478 U.S. at 403 n. 14, 106 S.Ct. at 3010 n. 14; *Castaneda*, 430 U.S. at 498 & n. 19, 97 S.Ct. at 1282 & n. 19. To effectively rebut plaintiffs' statistical evidence, defendants must offer credible evidence that explains the disparate impact on non-racial grounds. *Id.; see also Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 653–54 (5th Cir.1983) ("[t]he defendant must do more than raise theoretical objections to the data or statistical approach taken; instead, the defendant should demonstrate how the errors affect the results."), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984).

several groups"), *cert. denied*, —— U.S. ——, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

This defendants have failed to do. There is no proof in the case to rebut the gross deviations found by Christensen. In most cases, although criticizing Christensen's analysis as improperly performed, defendants cite no evidence that performance of the tests in some other manner would yield a significantly different result. For example, the defendants charge that, in calculating the relative proportion of whites and minorities in preferred jobs and comparing the figures with general population proportions, Dr. Christensen wrongfully assumed that the entire general population was available for programming. In reality, assert defendants, many inmates are never available for programming, either because they are in college, subject to security restrictions, etc. Yet defendants produce not one shred of evidence that, had plaintiffs' expert considered only those inmates eligible for programming under defendants' criteria, the results of his analysis would have been any different.

Similarly, defendants assert that Dr. Christensen ignored the prison's current practice of assigning housing based on programming assignments, which practice, in defendants' view, proves that housing assignments are not based on race. This argument is circular because Christensen found that the program assignments themselves were influenced by race. Defendants offer no explanation for the dramatic racial disparity apparent in the programing statistics. It is not surprising, given Dr. Christensen's finding of gross statistical disparities in the area of programming, that a housing system based on job assignments would similarly reflect that racial disparity. By virtue of the magnitude of the disparities, the statistics support a finding of intentional discrimination in programming and in housing.

Without detailing each of the many attacks launched at plaintiffs' statistical evidence, the Court finds these criticisms sometimes trivial, often irrelevant and completely unpersuasive. Defendants certainly had the opportunity, but decided not to present expert testimony to rebut Dr. Christensen's conclusions. Many of the attacks launched by defendants at this stage on plaintiffs' statistical evidence were not even raised during cross examination of plaintiffs' expert. For all these reasons, I decline to strike Dr. Christensen's testimony. On the contrary, I accord the testimony great weight and I concur in Christensen's opinion that the statistics point to the inevitable conclusion that the disparities in housing, jobs and discipline could only be accounted for on the basis of race.

Convincing as the statistical evidence is, I need not decide whether this is a case in which the pattern of unexplained statistical disparities is strong enough to support a finding of discriminatory intent standing alone, for plaintiffs have adduced substantial additional evidence supporting such a determination. *See Pitre v. Western Electric Co.*, 843 F.2d 1262, 1269 (10th Cir.1988) ("a finding of discrimination based generally on a showing of discriminatory acts and attitudes is not clearly erroneous because the district court also considered statistics that a social scientist would find insignificant."); *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 817 (5th Cir.) ("If the statistical disparity is insufficient alone to establish a prima facie case, the plaintiff may get over his or her initial hurdle by combining statistics with historical, individual, or circumstantial evidence."), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982).

More than twenty witnesses, both present and former inmates as well as staff, testified to scores of incidents from which a clear pattern of racial animus emerges. The evidence is overwhelming that an entrenched attitude of discrimination and racism exists at Elmira. This historical background evidence of animus strongly supports the inference that housing and programming disparities resulted from intentional discrimination. *See Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564.

The evidence established that inmates and staff knew that certain housing blocks were preferred. Several top administrators admitted that they knew of the disparate treatment toward minorities in housing but did little to rectify the matter, at least until this lawsuit was filed. For example, former Superintendent Ross and defendant Superintendent Miles testified that they

knew that the small blocks and the Honor Block contained a disproportionately high number of whites and yet apparently little was done to correct the imbalance. In the Honor Block changes are now made only by attrition.

Witnesses also testified regarding instances in which prison procedures, supposedly centralized in order to avoid disparate application, were ignored or departed from to the advantage of white inmates. Examples of this was the testimony of Thaxton Hamlin and Otu Obot, who both stated that they had observed white prisoners working outside their formal program assignments, presumably by virtue of the intervention of lower staff members. *See, e.g.,* Tr. Vol II at 981–82 (Obot). Otu Obot's testimony was remarkable in several respects. The testimony showed just how entrenched the racial bias was at Elmira in some of the staff. Time and again Obot's efforts to make race-neutral program assignments were thwarted by staff and guards. Incredibly, in a few instances, Obot was himself harassed and intimidated by the offending guards. Apparently, nothing was done by top administrators concerning Obot's complaints.

There was also testimony that Officer Curle, an avowed Klansman, vigorously opposed and actively thwarted the assignment of minority prisoners to the areas where Curle was stationed. Inmate Terrence McMichael, who unsuccessfully sought work on the cage floor, heard from Officer Wichtowski, who supervised that area, that he would not "let niggers work for him." Almost without exception, prisoners testified that only those with connections obtained desired jobs, and that application to the Program Committee usually was an exercise in futility. Such evidence of departure from established procedures also supports an inference that the resulting effect was intended rather than accidental. *See Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564.

## IV. CONCLUSION

### A. Liability.

In sum, I find that plaintiffs have proved by a preponderance of the evidence that defendants have systematically subjected blacks and hispanic inmates at the Elmira Correctional Facility to discrimination on the basis of race in the areas of housing and job assignment and in the imposition of discipline. The persistent nature of this conduct is such that it violates the Equal Protection Clause of the Constitution and it must cease. This conclusion is supported not only by substantial statistical evidence which establishes glaring racial disparities, but also by persuasive testimony from inmates and staff members to the effect that a pervasive atmosphere of racism infects decision-making especially at the lower levels of the prison's administration.

### B. Remedy.

Having decided that defendants have violated the Equal Protection Clause of the Constitution, I determine that injunctive relief is necessary. At this time, however, the scope of that relief needs to be determined.

The Court, of course, has substantial discretion to take whatever action is necessary to correct constitutional violations. Let there be no doubt of that. *See United States v. Yonkers,* 837 F.2d 1181, 1235 (2d Cir.1987); *Fisher v. Koehler, supra,* 692 F.Supp. at 1567; *Johnson v. Harris,* 479 F.Supp. 333, 337 (S.D.N.Y.1979). It is also clear that the Court should not fashion its own remedy without considering the requests of plaintiffs and especially without considering the expertise of defendants. Courts have recognized that in fashioning injunctive relief, the district court "must strike a balance in framing an injunction that will both redress the constitutional violations found and yet accord appropriate deference to the defendants' interests in running their own institution." *Fisher v. Koehler, supra,* 692 F.Supp. at 1567; *see Dean v. Coughlin,* 804 F.2d 207, 213–214 (2d Cir.1986). The Court must consider several factors before determining the precise parameters of the injunctive relief that is required. *See Todaro v. Ward,* 565 F.2d 48 (2d Cir.1977).

Therefore, in my view, there must now be a process developed to allow plaintiffs,

defendants and the Court together to fashion an appropriate injunctive order. Because of defendants' special expertise and responsibility, it makes sense that defendants submit a proposal in the first instance to remedy the problems raised by this lawsuit. Plaintiffs can react to that proposal and ultimately the Court will determine what relief is appropriate under the circumstances.

To this end, I direct the parties to meet together at their convenience but no later than thirty (30) days from entry of this decision to discuss (1) the practices and procedures that need to be implemented to rectify the violations found herein and (2) the terms of the injunction to be issued by the Court.

The parties will advise the Court within forty (40) days of entry of this decision of their progress.

IT IS SO ORDERED.